## CRUZ *v.* DOMÍNGUEZ.

## APPEAL from the District Court of San Juan.

### No. 50.—Decided June 15, 1905.

DIVORCE—DOMICILE OF THE SPOUSES—SPANISH SUBJECTS.—The courts of Porto Rico have jurisdiction to issue a decree of absolute divorce between spouses residing in the Island, although the husband may be a Spanish subject, and the provisions of section 9 of the Civil Code are not in conflict with the application of this doctrine.

ID.—The domicile of the parties in an action for divorce will determine the law to be applied to the case in controversy.

ID.—RULE OF INTERNATIONAL LAW—OPINION OF THE LEGISLATURE.—The provisions of section 9 of the Civil Code must not be construed in the sense that the rule of international law by which the courts of the Island must be guided in actions for divorce, and even considering that such provisions might express the opinion of the Legislature upon the matter, such opinion is not binding upon courts of justice.

ID.—PRINCIPLES OF PRIVATE INTERNATIONAL LAW.—Porto Rico being a territory of the United States, the principles of private international law to be applied in its courts, must be the same as those developed in the United States, at least in actions for divorce.

ID.—TREATY OF PARIS—CIVIL STATUS OF FOREIGN SUBJECTS.—The provisions of article 9 of the Spanish Civil Code are in conflict with the provisions of article 11 of the Treaty of Paris, and so long as it remains in force the provisions of article 9 of the Civil Code of Porto Rico cannot be construed so as to permit, for reasons of comity or courtesy, the Spanish law to govern the civil status and condition of Spanish subjects in Porto Rico, because they are subject in civil and criminal matters to the jurisdiction of the courts of this country and to the ordinary laws governing the same.

ID.—CHANGE OF SOVEREIGNTY.—Spanish subjects residing in Porto Rico when the change of sovereignty took place, and who allege that they are citizens of Spain, must duly prove that they have not lost their rights to claim Spanish citizenship by complying with the provisions of article 9 of the Treaty of Paris.

STATUTES—DIFFERENCES BETWEEN THE SPANISH AND THE ENGLISH TEXTS.—In cases where differences exist between the English text of a law and the Spanish text of the same, the English must be regarded as the original text, because it is the copy signed by the Governor, and therefore the Spanish text must be subordinated thereto.

DIVORCE—CRUEL TREATMENT AND GRAVE INJURIES.—The phrase ''cruel treatment,'' used in subdivision 4 of section 164 of the English text of the Civil Code, possesses a sufficiently wide signification in modern jurisprudence to include any case where the complaint may have been based upon *grave injuries,* and where the court considers the same sufficiently proved.

ID.—In order that an action for divorce based on grave injuries may be successful, it is necessary that the offensive words be of such a nature or accompanied by such acts that the effect produced is equivalent in itself to cruel treatment.

ID.—EVIDENCE—TESTIMONY OF RELATIVES, FRIENDS OR SERVANTS.—Although the circumstance that the witnesses are relatives, friends or servants of the parties should be taken into consideration by the court in considering the evidence, and the credibility to be given to their testimony is a matter for the exercise of sound judgment by the court, it must be borne in mind that in divorce cases it is generally necessary to depend upon the testimony of relatives, friends and servants of the parties, and that the testimony of such persons is presumed to be true in the absence of proof to the contrary.

ID.—The words "prostitute," "whore," and others of like signification addressed by the husband to his wife, and accompanied by acts of violence inducing in her a fear of being beaten, constitute the cruel treatment and the grave injuries according to the general acceptation of these words, and which the Civil Code mentions as grounds for divorce.

ID.—The fact that the acts constituting cruel treatment and grave injuries were committed by the husband some months before the filing of the action for divorce, he having been absent from the home during that interval, will not be an impediment to the success of the action, since it is not necessary that it should be immediately filed.

The facts are stated in the opinion.

Mr. Bosch, for appellant.

Mr. Díaz Navarro for respondent.

Mr. Rossy, fiscal, for The People.

Mr. JUSTICE WOLF delivered the opinion of the court.

On the 7th day of February, 1898, Moisés Domínguez y Martínez married Doña Rafaela Cruz y Soler, widow of Don Domingo Lobato. The certificate of registration sets out that Domínguez was a native of Spain and a resident of San Juan. Rafaela Cruz, at that time a native of Porto Rico, also had her residence in San Juan. On the 15th of February, 1904, the said Rafaela Cruz, the respondent in this court, brought a suit for divorce from the bonds of matrimony, alleging "cruel treatment and grave insults," under subdivision 4 of section 164 of the Civil Code of Porto Rico. The District Court of San Juan granted the divorce and the appellant in this court attacks the judgment, principally on two grounds:

First. That the defendant and appellant being a Spaniard,

his personal status and consequently that of his wife, are governed by the laws of Spain, which do not permit an absolute divorce to a Spanish subject.

Second. That the court erred in giving credence to the witnesses of the complainant, the credibility of such witnesses having been impugned by the defendant.

In February, 1901, in the case of *Maria del Carmen de Marimon* v. *Francisco Pelegrí y Roger,* this court decided that where the parties were domiciled in Porto Rico, the courts of the Island had jurisdiction to grant an absolute divorce, although the husband was a subject of the King of Spain. The appellant, however, contends that after that case was decided the Civil Code of Porto Rico went into effect; that section 9 of that Code makes the laws of Porto Rico govern the status and conditions of its citizens wherever they go; and that reciprocity or comity would require the courts of Porto Rico to apply the laws of Spain in dealing with Spanish subjects.

The Pelegrí case was decided in 1901. In its files is found the able and disinterested opinion of the Attorney-General of Porto Rico, to the same import as the subsequent pronouncement of the court. So that in 1902, when the Civil Code went into effect there was a declaration of policy made, not only by the highest court of the Island, but also by the chief executive officer having to do with legal matters. Under these circumstances it will not lightly be presumed that the legislature, by the enactment of section 9, intended to change the policy of the existing law.

The section in question does not lay down the rule of international law that we should follow in divorce matters, but even supposing that it expressed the opinion of the legislature there is authority to the effect that such an opinion would not bind us. (See Bishop on Marriage, Divorce and Separation, Edition 1891, Volume I, sec. 12, and Volume II, sec. 835.)

At the time of the publication of Story's Conflict of Laws

the courts of the different States were generally making the domicile of the parties the test of the law to be applied. To-day that policy may be considered definitely established. As contended by the appellee, quoting Mr. Harlan, the intimate relations of the different States, ease of transportation, immigration, and other local conditions made such a policy imperative. Even if this Island were not under the jurisdiction of the United States the number of Spaniards and other foreigners domiciled here (and many married to Porto Ricans) would drive the Porto Rican courts to enforce their own statutory law. However, Porto Rico belongs to the United States, and the principle of private international law which its tribunals should follow, at least in divorce matters, is naturally that which has been developed in the United States. Furthermore, although another foreigner might invoke the law of his country, we think it was the purpose of article 11 of the Treaty of Paris to establish a different condition of affairs for Spaniards.

That article provides:

"The Spaniards residing in the territories, the sovereignty of which Spain by this treaty cedes or relinquishes, shall be subject in matters civil as well as criminal to the jurisdiction of the courts of the country wherein they reside pursuant to the ordinary laws governing the same; and they shall have the right to appear before such courts, and to pursue the same course as citizens of the country to which the courts belong."

The court in the Pelegrí case held that section 9 of the Spanish Civil Code was opposed to the provision of the treaty. Similarly, during the continuance of that treaty, no such effect can be given to our own section 9 as contended for by the attorney for the appellant.

It should be added that the appellant has not clearly shown that he is a Spanish subject within the provisions of Article IX of the Treaty of Paris. The only proof in the

record is the certificate of the Spanish Consul, made in 1902, that the appellant was a resident of Spain and had been in this Island since the 28th of October, 1901. The marriage certificate, however, shows that Domínguez was a resident of San Juan in 1898. While his Spanish nationality may be an absolute fact, yet he has not shown a compliance with the Treaty, which provides:

"Spanish subjects, natives of the peninsular, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory, or may remove therefrom, retaining in either event all their rights of property including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside. The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."

It is true that the pleadings show that he went to Spain in 1899 and was there two years or so, but it is not demonstrated that he returned to Spain within the meaning of the Treaty, or that, at any time since his marriage he gave up or intended to give up his Porto Rican domicile.

Before passing to the other question raised by the appellant it is necessary to consider another point which was suggested by the appellee, namely, the conflict between the Spanish text and the English text in regard to the 4th division of section 164 of the Civil Code. The English words are "cruel treatment or grave injury." The Spanish words are "el trato cruel ó injurias graves." There can be no doubt that the English text, which was signed by the Gov-

ernor, is the law which must govern; but from the construction which we have put upon the phrase "cruel treatment" these words under modern jurisprudence are broad enough to cover any case which we should consider sufficient where the complaint alleged *"injurias graves."* In other words, in order that insulting words may entitle the plaintiff to a divorce they must be of such a nature, or accompanied by such other acts that the situation produced will amount in itself to cruel treatment.

We are in accord with the second *considerando* of the court below, and we agree with the attorney for appellee that while consanguinity and friendship, or the fact of having been a servant, may guide the court in forming its estimate of the proof, the weight it will give the statement of witnesses so affected depends upon the judgment of the court itself.

According to the appellant no weight is to be given to the testimony of the witnesses because they were, respectively, a first cousin, an intimate friend who was being supported, an emancipated slave raised in the house of the complainant, another intimate friend, a former cook's cousin who, on occasions, had been fed in the kitchen, and another servant. All these persons are presumably honest, and nothing is here presented which would entitle us to disregard the evidence of any one of them. In this class of cases it is generally the evidence of relatives, friends and servants that has to be relied on, and the court below did not err in considering the testimony. There was no evidence for the defendant.

It remains for us to consider whether the proof is sufficient to make out a case of cruel treatment. The witnesses are a little indefinite as to time and place, but the defendant, by question, could have made them answer a little more precisely. No question of the statute of limitations is raised.

The appellant in this case not only gravely insulted his wife by calling her "bitch," "whore" and words of like import, but the testimony of the witnesses, Miranda, Juan Soler and Masana, also indicates that he threatened his wife if he did not actually assault her. This course of conduct, if it did not endanger her life or impair her health, was sufficient to induce the fear of physical violence and therefore was the cruel treatment contemplated by the statute if the words are to be taken in the ordinary signification as required by section 14 of the Civil Code. (See in this connection: Am. and Eng. Enc. of Law, 2d Edition, vol. 9, p. 799; Bishop on Marriage, Divorce and Separation, paragraph 1569.)

It may be true, as alleges the appellant, that all these acts took place before he went to Spain, some ten months before the filing of the suit, but the appellee was under no obligation to commence proceedings immediately, and it may very well be that the return of her husband infused her with new terrors and made her determined to avail herself of the right to which his course of conduct entitled her.

It follows that the judgment of the district court dissolving the marriage between the parties must be affirmed.

*Affirmed.*

Chief Justice Quiñones and Justices Hernández, Figueras and MacLeary concurred.